28 C.C.P.A.(Patents)

## GROLL et al. v. REID.

Patent Appeal No. 4430.

Court of Customs and Patent Appeals.
April 14, 1941.

Rehearing Denied June 9, 1941.

A. B. Bakalar, of San Francisco, Cal., for appellants.

E. P. Boynton, of New York City, for appellee.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Justices.

GARRETT, Presiding Judge.

This is an appeal from the decision of the Board of Appeals of the United States Patent Office reversing that of the Examiner of Interferences in an interference originally declared July 30, 1937, and redeclared May 21, 1938, between an application of Reid (hereinafter referred to as appellee), serial No. 730,467, filed June 13, 1934, and an application of Groll et al. (hereinafter referred to as appellants), serial No. 92,691, filed July 25, 1936.

Only two counts are involved. They were proposed by appellants during the motion period in the Patent Office, other counts in the original declaration having been eliminated by an order of dissolution. The involved counts read:

"1. In a process of preparing a pure aliphatic monobasic carboxylic acid from the corresponding impure acid obtained by the oxidation of an aliphatic aldehyde with molecular oxygen and wherein said impure acid has been removed from the aldehyde oxidation stage, the step of treating said impure acid in the liquid phase with molecular oxygen in the presence of an oxidizing catalyst.

"2. In a process of preparing a pure butyric acid from a corresponding impure butyric acid obtained by the oxidation of a butyraldehyde with molecular oxygen and wherein said impure butyric acid has been removed from the butyraldehyde oxidation stage, the step of treating said impure butyric acid in the liquid phase with molecular oxygen in the presence of an oxidizing catalyst."

Both parties filed preliminary statements and took testimony. The Examiner of Interferences found that appellants reduced the invention to practice "April 25–26, 1932." Impliedly the board approved this

and the finding is not challenged by appellee.

As to appellee, the Examiner of Interferences awarded him a date of conception as early as March, 1932, but held that no date earlier than April 11, 1933, could be awarded him for actual reduction to practice and further held that he failed to show diligence from just prior to April 25-26, 1932 (the date awarded appellants) until April 1933. The board took the view that appellee established actual reduction to practice by March 25, 1932, and so found it unnecessary to discuss the question of diligence.

In the brief of appellee before us little is said relative to the question of diligence, and, obviously, he relies for success in the controversy upon the board's award of prior reduction to practice being sustained.

The record shows that in 1931 or 1932 there arose a commercial demand for a product of the kind which may be produced by the process of the counts, and that the experiments of both appellants and appellee were carried on substantially contemporaneously in an effort to develop such product. The experiments of appellants were performed at laboratories of the Shell Development Company, located at Emeryville, California, and those of appellee at a plant of the Carbide and Carbon Chemical Corporation (to which his application is assigned) located at South Charleston, West Virginia, by which he was employed as a research chemist. His principal assistant in carrying out the experiments was Samuel C. Barnett, a chemical engineer employed by the company, whose testimony was taken in the case together with that of appellee himself. Other witnesses were Granville A. Perkins, who seems to have been director of research of the company and the immediate superior of appellee; H. C. Holden, associate superintendent of research and development; George O. Curme, Jr., vice president of the company and director of research, whose principal office appears to be in New York City; Clyde H. Walters and Channing M. Lovell, assistants to appellee in research work.

Numerous documentary exhibits were placed in evidence.

Much of the testimony of the witnesses while pertinent in fully developing appellee's case is unimportant so far as the narrow issues upon which we are required to pass are concerned and need not be reviewed in detail.

It appears that as early as 1923 some interest was taken by persons connected with the Carbide and Carbon Chemical Corporation in the formation of aliphatic acids from corresponding aldehydes but no active work was pressed until the early part of 1932, at which time an order was received from Hercules Powder Company for a substantial amount of butyric acid, such as that which results from the process of the counts. There was then assigned to appellee, as stated by the board, "the job * * * of developing a process for the purification of butyric acid obtained by the oxidation of butyrl aldehyde," and the experiments, which are claimed to have culminated in success in March, 1932, began in February, 1932.

The board states: "Prior to this activity the making of aliphatic acids from the corresponding aldehydes through oxidation in the presence of a suitable catalyst was old and well known, but in this reaction there was always produced an impurity which gave the acid produced a yellow color. The exact composition of this impurity was not determined until later."

The Examiner of Interferences obviously made a very searching study of the record and his discussion, as it appears in his two decisions (the second on a request for reconsideration), is elaborate and thorough. From his analysis and evaluation of the evidence he was convinced that while it appeared to show that appellee had conceived a process for purifying crude butyric acid by aeration in the presence of an oxidizing catalyst as a result of laboratory work by Barnett in March, 1932, "Such work * * * appears to have fallen short of a satisfactory demonstration of such process and amounted to no more than an abandoned experiment."

The decision of the board is not so detailed as that of the Examiner of Interferences, but it reviews the evidence bearing upon the work at the time of the critical period—March, 1932.

One of the exhibits placed in evidence consisted of a collection of pages (photostatic copies) of a laboratory note book wherein a record was kept of a number of experiments during February and March, 1932, in connection with the preparation of butyric acid free from the impurity which gave such acid a yellow color.

Of this the board says: "These pages show that many different schemes were used to overcome this difficulty but apparently the only page that need be seriously considered is 39. Part of this preliminary work was done by Dr. Reid personally and the rest of it by his assistant, Barnett. On page 39 occurred the notes in the handwriting of Barnett of an experiment carried out by him in which he took crude butyric acid which he stated in his oral testimony was obtained through the catalytic oxidation of butyrl aldehyde, and blew air therethrough in the presence of ammonium vanadate as a catalyst. It must be admitted that the data given for this reaction is far from complete, but what is stated there keyes in with the oral testimony of the party Reid and his witness Barnett and also with the subsequent work reports."

It may be said that the page above alluded to bears date of March 10, 1932. The matter recorded thereon is identified as being in the handwriting of Barnett who testified, in effect, that he obtained it "directly." Appellee testified that the experiment was witnessed by him, and when asked to describe it in detail replied: "Some yellow butyric acid was treated with a small amount of ammonium vanadate, and a small amount of manganous acetate, and air was blown through the mixture at a temperature of 100°C. for almost four hours. A piece of aluminum was placed in the liquid apparently in order to determine whether aluminum equipment would suffer corrosion under the conditions of the experiment."

Allusion to the testimony of Barnett upon this and other points will be made later.

For the present it may be said that we do not regard it as being sufficient of itself to establish reduction to practice on the part of appellee. The Examiner of Interferences, in our opinion, stated the situation succinctly and accurately in the analysis which he made of the evidence on this particular and crucial point, his statement (omitting the page references given by ·him) being, in part, as follows:

"It is impossible from an inspection of page 39 to determine whether the experiment in question was in fact an oxidation of crude butyric acid as stated or whether it was an attempt to separate colorless acid directly from a reaction mixture from the initial oxidation of butyraldehyde in the presence of a mixed catalyst as was made over a year later by Walters * * *.

"Moreover, the data of the experiment purporting to be recorded on page 39 of exhibit 1 is admittedly *in*complete especially with respect to essential facts sought to be established thereby * * *. There is no indication therein that the product was distilled, that it was decolorized, what was the concentration of the final product, the manner of preparation of the crude acid, or the purpose of the aluminum pipe. Barnett admits that no effort was made to complete the experiment and to record the data, giving as excuse therefor that he personally was satisfied that the experiment was successful.

"Barnett's explanation of the purpose of the piece of aluminum pipe is somewhat confused * * *. Reid's explanation is obviously mere conjecture * * *. In connection with Barnett's reference to operations in copper equipment, it should be noted that Reid states that trouble with copper equipment occurred subsequent to the experiment described on page 39 of exhibit 1 * * *. Holden indicates that there was trouble with equipment made of copper, but his testimony does not aid in fixing any time for this event. Moreover, a letter, Reid exhibit 18, from Holden to Curme dated March 8, 1932, states that Reid had already purified butyric acid with air in the presence of vanadium oxide. Manifestly if the work was done March 10, 1932, according to exhibit 1, page 39, the letter does not correctly state the facts, either as to the time or the particular catalyst employed.

"In view of the confused and indefinite nature of this evidence little probative force may be ascribed thereto, and it can not be accepted as establishing that a process corresponding to the counts was successfully performed.

"Another circumstance adverse to Reid's claim is the absence of any reference to the March 10, 1932, experiment in the weekly reports for this period. Although, there is a statement in the March 8 letter, exhibit 18, and the report of March 11, 1932, exhibit 3, to the effect that crude butyric acid had been purified by aeration in the presence of vanadium oxide, no laboratory record of such an experiment has been introduced in evidence, nor has any explanation been offered for the absence of such record.

934

"At the most the evidence adduced relative to Reid's activity in March of 1932 appears to show that Reid had conceived of a process for purifying crude butyric acid by aeration in the presence of an oxidizing catalyst as a result of laboratory work by Barnett. Such work, however, appears to have fallen short of a satisfactory demonstration of such process and amounted to no more than an abandoned experiment."

We observe from the testimony of Barnett, given in connection with notations made by him relative to experiments carried on after March 10, 1932 (when it is claimed a white product was produced), and before March 25, 1932, after which latter date Barnett ceased his personal participation in the work, that in every instance the material produced was yellow. While this may be explainable in a manner not inconsistent with the production of a white material on March 10, 1932, we think it somewhat significant, a white material being the great desideratum, that only in the single instance during the critical period was one produced.

After making the statement above quoted, the Examiner of Interferences recited the continuation of experiments by others than Barnett over a period of several months, as shown by various of the exhibits in evidence, and directed attention to the fact that many of the reports embraced in such exhibits "are in marked contrast to the fragmentary, unsatisfactory ones of Barnett upon which Reid relies as support for his asserted completion of the invention in March of 1932."

From our study of the evidence, we feel constrained to agree with the evaluation of it made by the Examiner of Interferences.

A fact upon which appellee strongly relies as evidencing the success of the process is that about March 25, 1932, 3,000 pounds of butyric acid were produced and shipped to the Hercules Powder Company, and accepted by it. If it were satisfactorily established, under the rules of evidence respecting corroboration, etc., that that acid was produced by the process of the counts, we should regard its production as being very persuasive in appellee's favor, but a close analysis of the evidence respecting it, such as was made by the Examiner of Interferences, discloses that it is lacking in important particulars. In his original decision he said: "Certain

evidence also has been adduced on behalf of Reid to the effect that in the spring of 1932 a large quantity of butyric acid prepared according to the process in issue was sold to the Hercules Powder Company and accepted by them, although that company subsequently rejected other shipments. There is little reason to doubt that butyric acid may have been sold in 1932 to the powder company, but such fact can not be accepted as proof that the Carbide company had successfully reduced to practice this invention on either a laboratory or commercial scale. Subsequent events are deemed to negative any possibility of such assumption. In addition there is no documentary evidence directly pertaining to the production of this shipment, nor is any reason given for its omission. It is not reasonable to assume a large and efficient corporation, such as the Carbide company appears to be, would prepare a large quantity of a product by a novel process without making and preserving an accurate record of the operation for future reference. Indeed the probable importance of such event would seem to make this action mandatory, and the lack of such records can only give rise to the inference that some other method was actually used in the manufacture of material for this transaction."

The foregoing is, of course, somewhat general in its nature, but in his decision on the petition for rehearing the Examiner of Interferences became specific, saying:

"Actually, Reid's claim to have reduced the invention to practice by the preparation, as defined in the counts, of the acid for Hercules rests substantially entirely on the testimony of Barnett alone.

"In view of Barnett's confused and unsatisfactory testimony concerning his 1932 laboratory work it is by no means certain that he accurately recalls the true facts concerning the purification of the Hercules shipment and his testimony is not convincing on this point. It is impossible to determine definitely whether or not Reid participated in in such work, but in view of the circumstances his testimony thereon seems to be substantially hearsay based on the statements appearing in exhibits 4 and 5. As for that of Curme, Holden and Perkins, there is no question that they have no first hand knowledge of the method of preparation or purification of the Hercules shipment, and in view of the obviously

hearsay nature thereof their testimony on this point is entitled to no consideration whatever."

The board said:

"The Weekly Progress Report dated March 25, 1932 states that the purification of the crude butyric acid was completed on March 23, 1932 and that 3000 pounds were shipped to the Hercules Powder Company. An analysis of this acid is given. Both the party Reid and his witness have testified that this acid thus shipped to the Powder Company was purified by the process set forth in the counts of the interference, and this testimony is, in part, at least corroborated by the witnesses Perkins and Holden. While it is true that these two witnesses were probably not present at all times while this batch of acid was being made, still from the nature of their positions it was essential that they be thoroughly posted on what was going on. It is natural to assume that if they were doing their duty they would have to be thoroughly familiar with important developments of this kind and therefore their testimony cannot be ignored.

"The Examiner of Interferences apparently does not question the fact that the Carbide Company did have and did ship to the Powder Company by March 25, 1932 purified butyric acid which came within the specifications of the Powder Company but contends that this was only an abandoned experiment for the reason that a later date, that is in the fall of 1932, witnesses Walters and Lovell were assigned the job of further investigation of methods of purifying acids of this kind. We are of the opinion that the assumption that this later work tended to show that the work done in March 1932 was unsatisfactory was not warranted. Companies engaged in the manufacture of chemicals must necessarily carry on at all times development work for it would obviously be dangerous to assume that any method however successful which they might employ could not be improved. It frequently happens that through such development work the process can be greatly cheapened or perhaps a more economical way can be developed. The process in issue is one that involves considerable time and expense. There are two distillations and two stages of aeration and the latter consumes considerable time. It was but natural that the Carbide Company should endeavor to shorten the work. If the impurity resulted from using impure aldehyde perhaps the purification would be unnecessary and also if the addition of an oxidizing agent could be substituted for aeration and second distillation it would be very desirable. This subsequent investigation following the successful operation in March 1932 cannot be regarded as evidence of failure, but a normal attempt to improve on a successful but expensive method. Up to this time the only acid which they had attempted to deal with was butyric acid but they had reasons for assuming that other aliphatic momobasic carboxylic acids could be purified in the same way and this further study was directed mainly to such acids."

The study which we have made of the record leads us to the conclusion that the board gave to appellee the benefit of assumptions to which he was not entitled and that the Examiner of Interferences should not have been reversed upon the facts appearing.

As has been indicated, appellee before us virtually waived any question as to diligence. This was entirely consistent with his claim respecting reduction to practice. Naturally, if his claim in that respect were sustained, diligence would play "no part in his case," but since we are unable to sustain such claim, it is proper that the diligence question be passed upon. The period during which diligence on his part was required began just prior to April 25–26, 1932, the date awarded appellants for reduction to practice. We find no evidence of any activity on the part of appellee or his assistants from March 25, 1932, to April 25, 1932. Any experiments made thereafter could not inure to his benefit in this controversy. Hence, diligence may not be awarded him.

For the reasons stated, the decision of the board is reversed and priority awarded appellants.

Reversed.